Good morning, Your Honors. My name is A. Clifton Hodges. I'm here representing a young man who some seven and a half years ago had what he started out in the morning thinking was good fortune, ended up having the bad fortune of missing a day of school. It happened to be a day that some 20-plus federal agents working for the Internal Revenue Service… I think we're familiar with the facts. Could you zero in on what the evidence is that the officer or officers held a gun to Ephraim's head? Certainly, Your Honor. The evidence comes in two places. Primarily, it comes from the deposition testimony of young Master Tekle, who was… Give us an excerpt reference when you're talking about it. Yes, certainly, Your Honor. He begins at page 523 of the clerk's transcript in answer to a question about, tell me, beginning with when you woke up that morning, what happened? I have… I don't have… Are you talking about his deposition? It is his deposition transcript. I'm looking at the deposition, and I see the insult about being Ethiopian, but that's not a constitutional violation. I'm looking for the gun. Well, I'm looking… Before we get there, I'm looking for the page. Page 523, Your Honor. Well, I have 442 and I have page 46 and page 40 all on the document that I have. Do you have any of those other pages? It appears in two different places. Yes. I don't care why it's… My question is, in the reporter's transcript, there's page 40. This is page 39. So it's page… 39, right? It starts at page 39. Thank you. Okay, I'm with you now. Thank you. Okay. And he goes on and explains everything that took place, and one of the things he mentions there is that they held a gun to his head, or they had a gun. Where? And counsel asks him about that. Wait, where? Just page and line. I just want to read it. I mean, I've got… The guy from the car yelled on the intercom, young man, turn around with your hands up, and… Line 20. Yes. I got it. Thanks. Counsel then expands in his questioning about that later in the deposition transcript and asks him specifically, and I apologize to the court, but my… Page 58 of the reporter's transcript. Yes, that's correct. I had a gun on my head at line 5. That's not even the part I wanted to read to the court. About page 65, I seen a black object, which looked like a gun to me while I was lying down. That was also part of it, Your Honor. And then I felt the object on my head, which I then knew the guy had a gun on my head. Correct. Okay, and that's when he's lying down, right? That's when he's lying down. By his account? By his account. Okay. Is there any other evidence in the record besides his testimony, his account, that there was a gun pointed at or placed at his head? Are you relying just on Ephraim? No, I am not relying just on that. He talks, well, he mentions it again at the end of his deposition, but the only other witness, aside from the federal officers who were present, who either have no recollection because they were focused on the house, of what was going on with Master Teckley, or Agent Hawks in particular, who was having an interface or an interaction. Could we back up just a second? At the bottom of page 536 of the excerpt, page 65 of the reporter's numbering, he says, at which point did the officer start handcuffing you? After, I believe, after he took the gun off. So after the officer removed this object from your Does that mean the policeman had the gun at his head until he handcuffed him? He handcuffed him, no more gun? No, it does not mean that. And he explains, or as I understand the totality of his discussion about the gun, it's a little bit confusing, and I'll grant you that, but we have independent testimony from his father, who's in the process of being arrested willingly, if you will, because he's been called by Agent Jankowski. He's up on the second floor of his residence when he receives the telephone call. The telephone call is made at the same time that another agent with the remote control that they have received from Mrs. Teckley at her arrest are Jankowski's talking to father on the second floor, asking him to surrender himself and notifying them that they're there. The father agrees that he will willingly come downstairs and appear at the front door and submit to arrest without any further colloquy. That's when the agents are proceeding toward the front door and they meet Solomon Teckley, the father, at the deposition, which was taken on Terminal Island and which is part of the record in this case. On page 577, I believe, is the beginning part in the transcript, starting at page 10 of his deposition, he says, and outside of my gate I saw my son handcuffed, sitting on the curb, his feet folded, holding his gun and my son sitting under his feet, and another officer standing in front of my son with a shotgun. Okay, but these were not the incident where the gun is pointed at his head that Ephraim's talking about. Ephraim is talking about at the initial encounter when he's proned out or he prones himself out, whichever way one wants to read that, and the interval between that and the cuffs is when he says the gun was physically put at his head. Is there any... The only evidence for the gun being in contact, in actual physical contact, with Ephraim Teckley's head is during the time that he is on the ground and in the process of being handcuffed. Or pointed. I mean, this testimony you just gave us from the father doesn't say it was pointed at the hand instead of your holster. I understand, but if you go forward a bit to page 15 and 17, and more importantly 17, I suppose, of Mr. Teckley's deposition, starting at line 19 on page 17 of his deposition, it says it was a handgun. He had a handgun in his hand. And then he goes on to describe that the handgun was at the back of Ephraim Teckley's head, within six inches of the head, pointing downward. He says it was pointed to the ground. And then he goes on... Line 25. Where was the gun pointed? Down to the ground. That's not the head. He goes on, on page 50, or page 586 in the clerk's transcript. You said, question, you said there was a guy holding a gun right above Ephraim's head. You testified the gun was pointing to the ground, right? Yeah. Ephraim was sitting on the curb. The guy standing right behind him holding the gun down like this. So that every time Ephraim turned around to look at me, the gun is in his face. Ephraim is sitting here, and he goes on to explain that it's about six inches away, down at line 23. How far was Ephraim sitting in front of the officer? About six inches right next to him. The officer with the shotgun was not pointing at Ephraim. The officer with the shotgun, according to this testimony, the officer just has it across his arms and is standing there, I guess, as a symbol of authority. Okay. Now, does Ephraim ever testify about the second episode with the gun? He wasn't specifically asked about it, as far as I recall, during his deposition. And you didn't put in any corroborating statement by him? We put in a separate declaration on his behalf, Ron. Okay. But according to his father, Ephraim was aware that the gun was there because every time he turned around, it was in his face. Yes, he was attempting to try and see what was going on with his father. You can imagine the stress. All right. And you're not relying, I take it, on the neighbor that Mrs. Teckley claimed made a statement with which the neighbor vociferously disagreed? We are not, and it appears from our interviews with her that that information she got from other sources, and we were never able to find those other sources or contact them. So there is no other independent evidence. Now, could I just ask one final question? If the gun aspect is taken out, let's assume that Ephraim's testimony was discounted out, is your case then over with or would you argue that there's excessive force from anything else? Let me finish. You're going to answer the wrong question. If you take out the gun, so that's out of the picture for whatever reason, and under the totality of the circumstances, would there be excessive force either through the handcuffing, through the spitting on the shoes, the obscenity regarding Ethiopia, any of that, or is this case really turned just on whether or not the gun was pointed at the head with the rest of that being sort of background? My response to your question, Your Honor, is this. In my mind, the case turns on the gun and the outrageousness of the officer's interaction with this 11-year-old child under the circumstances that they were confronted with as that process forward in time. Under the law, as I understand the law, especially under the Mueller v. Mina case, which counsel raised and put in recently by way of a separate submission. You're talking about the Supreme Court decision in Mina that reversed the Ninth Circuit decision. I am correct. Correctly, that's the one I'm speaking of, Your Honor. And in that case, we have rather than, as we find in most of these cases, that either arise under 1983 or in a Bivens setting as this one does, we find a person who is just simply a witness or an extra person found at a scene where an arrest is being conducted. I think that the circumstances that Mina found herself in when that arrest was going down and her detention took place were a lot more serious, a lot more frightening, a lot more severe. I read Mina the opposite of the way you do. I remember the case very well. As I understand it, Your Honor. And here's what happened in Mina. Mina was just this innocent woman who happened to be there when they were doing a drug raid. And she was really upset because the cops pulled her out of the house, I think in her pajamas or the sweats she was sleeping in, and barefoot, dragged her into the garage. I think they handcuffed her, made her sit in a chair for a couple of hours while they did the search, and they made nasty remarks to her. And she sued, and we said that her civil rights, that she was entitled to get to trial on a civil rights violation, and the Supreme Court said we were wrong because the police have an obligation to control the premises and people who may cause trouble when they're doing a search. And it's perfectly all right to put an innocent person under control and separate them. So it looks to me like all you've got is pointing the gun at the kid's head. I think in essence that's true, Judge. But I was, on the other hand, I read Mina exactly as you do. And what I was encouraged about in that case is we do have an innocent woman and an innocent adult. She's in a place where... Innocent woman in Mina, innocent kid here. Same thing. And we have an innocent child here. I think the standard of interfacing with an innocent child is different than... Here's my problem here. If it was a 16-year-old boy, I'd have no problem with putting a gun to his head until he was cuffed because 16-year-old boys have the ability to cause a lot of trouble. If it was a 6-year-old boy, it would be outrageous. 11, I don't know, how big is the kid? What does the record show about how big he is? He's about 5 feet tall. Does the record show what he looks like? I don't think the record before Your Honor shows that, but I think counsel and I agree that that's the approximate height of the child at the time. He was a little bit tall for his age. He wasn't heavyset or anything like that. But he's wearing underwear, basically, that he slept in, and he's taking the trash out. And we have officers who are viewing this scene in the following context. There's 20-plus officers who are armed waiting to make this arrest. I don't know what he's like. If I was taking the trash out of my house where I live, I would not be armed. If I was taking the trash out of some places where I've camped, I would be. This was a nice neighborhood. It was a big two-story home. It had gates in front of it, a big circle driveway that the gates allowed ingress and egress from. But here's the point. They had made special provision. They knew who was in the house. They'd had it under surveillance. They knew Mom and Dad and three children, two girls, and this young man lived there. They made and went to special lengths to make sure that they arrested Mom away from the residence because her normal habit was to take the kids to school in the morning. So they arranged to arrest her after she dropped the kids off. Unbeknownst to anyone, it turned out not to be a school day for Ephraim that day. That's the only reason he was at home. But when she was arrested without incident, they asked for and received a remote control to open the gates with. She advised them at that time that she's... We've read all this stuff. Focus me on something. Can I just ask, though, because I thought you were going to get to the point. They knew, is the record that they did know per the mom, that Ephraim was at home? She told them. She said, please be careful of my 11-year-old boys at home. My husband's just had surgery and he has a heart condition. All right. Is that a contested fact whether... It is not a contested fact. Excuse me, that Hawks individually knew that that information had been communicated to Special Agent Hawks, that Ephraim was at home? Hawks had no recollection, as I recall, his deposition testimony of whether he had been told that or not. If the evidence establishes he didn't know, personally didn't know, what effect does that have on the case? I'm not sure it has any, because Hawks at least knows that they have the remote control. He knows that mom's already been arrested. He knows what's going on to that extent. Whether somebody actually communicated to him, we know the child's at home, we know dad's at home, we don't know who else might be in there. Well, his position is he thought this was an unidentified, unknown person, and his action was simply to bring that stranger under control, and that's all he did. So it's a big difference, isn't it, if he knows that Ephraim has reason to know, knows, in fact, that Ephraim's at home or doesn't. Yes, it does on the face of it. However, when I hear that testimony and I read that declaration, what flies in my face is this. We have a thin, young person coming out of a garage in the middle of our raid. He is asked on the bullhorn, as the cars are driving up, to freeze, submit himself. He turns, because he thinks, according to his testimony and his deposition, he's talking to somebody else. We understand, Judge Kleinfeld. We understand. I just want the narrower question. But then he submits himself, Your Honor, and he's complying with exactly the same. I just asked about the knowledge of the agent, because the agent's perception is, turns on whether or not he thinks this is a stranger or it's Ephraim.  Okay, please. He then submits himself. Now, Cox testifies that he's concerned about the firing zone, the killing zone, if you will, this ten meters of open space between the front of the house and the gates. Right. Why, if he's concerned about the fact or the suspicion that this man has a gun in his house, does he have this person who is willingly submitting themselves at this point and following instructions, stop in the middle, get down on the ground, then he places himself in the middle of this zone to interface with him, to pat him down and do these other things? That is totally inconsistent to me. All right. That's the problem I have with Cox's testimony. And having 30 seconds left, I'd like to reserve just a moment. There is no picture of the kid or description that would give his size, weight, whether he shaves, all that sort of thing? Not in the record, Your Honor, but he did not shave at that time. And he testified at his deposition that he did not have cornrows at that time. He's black, because he's a black Ethiopian. Thank you, Counsel. Good morning, Your Honors. Assistant United States Attorney Frank Travieso on behalf of the United States and the federal agents. Your Honor, this is not a case in which federal law enforcement officers engage in reckless conduct without regard to the rights and safety of the appellant Ephraim Teckley. Is it true that we can't tell from the record what Ephraim Teckley looks like? I think, Your Honor, if you look at the declaration of Agent Hawks, the declaration of Thomas Jankowski. Tell me the excerpt sites. Sure. Agent Hawks' description is at line 5 of page 418 of the excerpts of the record. And if you'll bear with me, I've got to go back. And there, Agent Hawks describes him as somewhere between. He estimated Ephraim's height to be between 5 and 6 feet. Between 5 and 6 feet? Yes. Agent Jankowski. Doesn't that alone give you pause for a law enforcement agent to say something like that? I'm sorry, Your Honor? Doesn't it give you pause to hear a law enforcement agent's sworn testimony that he estimates someone's height to be between 5 and 6 feet? Your Honor, I think it's. That's almost totally ridiculous, isn't it? Well, if you look at the scene, I mean, you've got to realize. I'm looking at his affidavit, his declaration. We've all been lawyers and we've deposed policemen. They're always more precise than that when they're telling the truth. And if you look at Agent Jankowski, page 400, paragraph at line 5. He doesn't get him to 6 feet. He observed him to be about 5 feet tall. Right. He's pretty precise, Jankowski. But he wasn't. Fox is the guy who supposedly put the gun to Ephraim's head, isn't he? Allegedly. Allegedly. So it's his estimate. And he's within plus or minus a foot. Any more description to show whether he looks like a little kid or a dangerous teenager? No, unfortunately, Your Honor. I think also if you look at Keith Bowden's declaration, page 423, line 2, between 5 feet and 5 feet, 5 foot, 5 inches. But this is summary judgment. So what's your argument as to why summary judgment should be granted when there's all this factual dispute? This being part of it to some extent. Ephraim's testimony is that he saw a gun being placed at his head. You can argue whether it was a gun or not. But he says he was lying on the ground and then he was put into a kneeling position. But he felt the gun. His testimony on the face of it isn't inherently incredible. The officers have a different story. But why is this here on summary judgment? Well, I think, first of all, Ephraim's testimony is that he got a glimpse of a short black object. Assuming for the sake of summary judgment, we're going to take his facts as true. At the time that this action took place. Can I ask you one question there? Is there any proffer by Agent Hawks or the government as to whether there was no black object at all? It was like he mistook some other kind of thing in Hawks' hand for a gun? No, I do not believe that. So it's either Ephraim saw a black object that was a gun or there was no object at all. At least on the record that we have currently. But based on the record, we also have the testimony of Agent Hawks. Well, I understand we have his testimony. But that's a credibility issue, isn't it? Well, we also have the testimony of Agent Bode. Well, right. I don't understand something that you're saying. I start with Saucier v. Katz. I think that's the proper place to start because it's a Supreme Court decision that tells us how to decide these cases. And it says the first inquiry must be whether a constitutional right would have been violated on the facts alleged. That's the facts alleged by the plaintiff. So the facts alleged by the plaintiff are I'm an 11-year-old kid, 5-foot tall, a cop pointed a gun at me until he had the cuffs on me. Then we look second, assuming whether a constitutional right would have been violated on those facts. That's our second inquiry. And then we look at Graham v. Conner, no unreasonable force, and we look at a case that we decided, Robinson, that says pointing a gun at somebody without a real good reason to was unreasonable force. And it looks like you don't get your qualified immunity under Robinson. What am I missing here? Robinson was decided in 2002 by the court on Bonk. At the time that this action took place on March 23, 1998, the state of the law was not Robinson. The state of the law was McDonald. It was McKenzie, which were cases that required more than the mere pointing of guns. In those cases, the agents not only pointed the gun. I believe in McKenzie, they placed the gun between the eyes of the suspect and then threatened to pull the trigger. McDonald, it was a 9-year-old, put the gun directly to the 9-year-old's head, threatened to pull the trigger. That didn't happen here. Ephraim admits clearly during his testimony that no one spoke to him. Okay, so what you're saying is at the time the policeman allegedly put the gun at Ephraim Techley's head, the law of this circuit was McKenzie and McDonald, that it was okay to put a gun at a little kid's head during the course of an arrest of his parents so a reasonable policeman would not have known he was violating the kid's constitutional rights. It required more than the mere pointing of guns. So what I have to do now is look up McKenzie and McDonald and ignore Robinson because it came after the incident so the police could not have known about it. I believe Saussure is clear that you have to look at the time of the law at the time of the incident. Well, that's true. If Robinson said it was not the law, it was not clear as of 1995. It doesn't address 1998. I could not find any law that had changed McDonald. I don't believe McDonald is a Ninth Circuit case. It's a Seventh Circuit case. It's a Seventh Circuit case. McKenzie is clearly a Ninth Circuit case. Okay, and what is McKenzie? What are the facts of McKenzie? McKenzie was a situation where officers, without identifying themselves and in plain clothes, burst into an apartment, threw the individuals against the wall. They refused to identify themselves. They then took one of the individuals who was questioning the officers, placed a gun directly between that individual's eyes. How old was the person? That, I believe, was an adult. Okay, so your view of the law is that unless there was a case that said merely placing the gun, as opposed to placing the gun and threatening to pull the trigger, that McDonald doesn't make it clear to a reasonable police officer that putting the gun to the back of the head of a compliant 11-year-old dressed in T-shirt and shorts and barefoot, no reasonable officer could have understood that that was excessive force? Your Honor, I think that in the totality of the circumstances, what happened here was not reasonable. And had knowledge. And had knowledge. Let me throw this in, because I want to know if you dispute it. And had knowledge that an 11-year-old was in the house. He had knowledge that an 11-year-old resided in the house. He did not know that Ephraim was there that day. Well, I thought you conceded, I thought the government conceded, that the people on scene, per the mother's advice, knew that Ephraim had not gone to school. The testimony is that the mother told agents. Yes. Okay. Agents who then brought the remote and keys to the people on scene. But Agent Hawks clearly says he did not know it was. That's a disputed fact, isn't it? But I don't, but what you have to look at, Your Honor, is Agent Hawks is covering this home. Someone comes out. Just to answer my question, is that a disputed fact? We're here on summary judgment. I don't think that Ephraim never put into evidence that Agent Hawks knew he was there. Well, how would he know? What about the, you know, there's this line of cases on these, all these search cases. Government depends on it all the time about the collective knowledge of all the agents on the scene when executing the warrant. That's what we look at. You're familiar with those cases, aren't you? Yes, Your Honor. You know, what was happening here was. So isn't there kind of a presumption then that, you know, he knew or he should have known? I don't know that there would be a presumption that he should have known. Well, that's the law, that, you know, they can depend on the collective knowledge of all the agents in executing the search warrant. Isn't that the law? The testimony. I'm not prepared to answer that, Your Honor. I didn't brief that in my papers. If the Court would like, I would certainly go back and argue that. Well, isn't there enough? You're not prepared to argue it, but you're prepared to take the position that we have to assume for summary judgment that Hawks didn't know. I'm asking you now to assume that you may be wrong about that under Judge Ticino's line of cases or the fact that it is conceded that agents on the scene knew and a jury could reasonably disbelieve Hawks and conclude that he, because others on scene knew, he knew as well in this heavily planned assault on the house. So the fact pattern that we're looking at under the rubric as Judge Klinefeld laid out, I'm just trying to understand, is that the cops show up and under Ephraim's view of things, I understand Hawks denies that he had any gun, that he holstered it, that he was taking reasonable steps. That's the government's case. Understood. But we're looking at Ephraim's account of the events and that that includes that he's a five-foot kid of 11 years old who comes out in a T-shirt and shorts, barefoot, not visibly armed, presumably. Nobody seems to suggest he's armed, and says he's either proned out by Hawks or he lies down on his own volition and has got a gun pointed at his head. He's compliant, he's on the ground, and he's got a gun pointed at his head. And you're saying that a reasonable police officer under those circumstances, knowing that an 11-year-old school kid lives in the house, is justified in putting a gun to a head to a compliant 11-year-old and until Robinson wouldn't have known to the contrary because he didn't threaten to pull the trigger. Your Honor, I would like to throw one other thing in there. That's an argumentative question. It is. It is clear that Ephraim was trying to reenter the home. He was trying to go back into the garage. Yes, but at the time that all of this transpired with a gun is to the head, he's not doing that anymore. He's not trying to go back. He's turned around and he's compliant. Correct. But there's also nothing assuming that a gun was placed to his head. We have to assume that. That's what the case is about. And there's nothing to show that he couldn't have bolted, that he couldn't have reached around. Look, I've had three 11-year-olds. Most of us have had 11-year-olds at one time or another. I have, too. At that age, with any of the three of them, including the two sturdy boys, I could grab them and control them with my hands. Now, at least one of the boys could overpower me. I suppose the girl I could have controlled at any age. 11-year-olds, they're just not that big and strong. And what I'm trying to figure out is why a reasonable policeman would put a gun at the kid's head. And it looks to me like what the case comes down to is Robinson says he can't, but it's too late to do the plaintiff any good. McDonald says he can't, but it's a little distinguishable because the kid is 9 and the cop threatens to pull the trigger. On the other hand, it doesn't say he can. I don't understand why the cop has to put the gun at the 11-year-old's head because a kid that age, you don't need to have him do what you tell him to do when you say lie down and put your hands behind your back. You can just lie him down and put his hands behind his back. They're small enough. That's why I'm having trouble with this. Your Honor, number one, I'd like to remind the Court, and this isn't in the record, but 11-year-olds are just as capable based on recent events and unfortunate events in this country. 11-year-olds can kill somebody if they have a gun in their hand. No problem with that. But this kid, when a kid's in his underwear, you can pretty much tell he doesn't have a gun. If he's wearing a parka, maybe he has a gun in his pocket, but not if he's in his underwear. And there's no testimony in this case, is there, that Hawks thought the kid was armed? I think the testimony is that Hawks wasn't sure of what this person was doing. What doing? But is there any testimony put forward by Hawks or anybody that they thought Eflin was armed? His testimony is I was concerned that this individual would go back inside the house and either attempt to retrieve the weapon or enter into a hospital. Exactly. He's not inside the house. Or enter into a hospital. You can grab him. There comes a point where the kids outnumber you and some of them are bigger than you, and then you really need them to comply with your verbal commands. But when they're smaller than you and they don't outnumber you, you really don't. That's why the force is arguably excessive. Could you focus on this common sense of it and give me some case that shows it's okay? Well, I think if you look at the cases cited. I looked at McDonald and it goes the wrong way for you. Seventh Circuit says they violated the kid's constitutional rights by pointing the gun at him. And threatening to pull the trigger. It's arguably distinguishable, but it doesn't go the right way from your point of view. Well, I think that it certainly required more than the mere pointing of the gun. And I would like to point out, Your Honor, that on appeal now, Ephraim isn't saying that Agent Hawks is the one that pointed the gun at him. If you look at the opening brief, it says, Agent Hawks was patting him down, handcuffing him while another agent. How's he going to know which agent? Pardon? How's he going to know which agent until he's all done with discovery? Discovery was completed. This was not a case in which Ephraim moved under Rule 56F to conduct further discovery. He presented all the evidence he had to the district court. The district court determined no genuine, no material issue, no material. Well, what he knows is that a gun was placed at the back of his head, right? So whether Hawks did it or somebody did it, that's his testimony. He knows an object was. But you can't hold Hawks responsible if he's not the one being singled out. As a matter of liability, ultimately, you may be right as to whether Ephraim has stated a case that his constitutional rights were violated. That's where we are at this point on summary judgment. Is there anything in the record as to the training?  Yes, Your Honor. Are they trained like the FBI and they go through the Quantico training? I believe they go through. So they get the normal training of peace officers in the federal government? Yes. This is not just. I don't know that that. It was probably brought out in Agent Hawks' deposition, but I don't think that that was ever an issue and ever placed in front of the district court. Is there any evidence? Sometimes, a lot of times in these excessive force cases, there's evidence put on by one side or the other that talks, gets an expert to come in and testify as to whether this was excessive force or not under the circumstances. We did, in fact, have an expert come in. And I can't remember at this point if we presented that to his expert's report to the district court. But the government's position is the gun part never happened. Yes. Okay. So you wouldn't have an expert presumably coming in and saying even if he did put a gun to his head, it would have been within standard operating procedure? Well, I believe the expert took the testimony of Ephraim and analyzed it, even assuming his facts as true. Okay. But that's not in the record? I'm sorry, Your Honor. I can't remember. You think there may be expert testimony in the record that says it's okay to put a gun to the guy's head as an expert? I believe there might be in 1998. Okay. That hasn't been cited to us, though. No, I don't believe so. Is there any more law that we should look at besides Robinson, McKenzie and McDonald on pointing guns at kids' heads? Your Honor, there's not. There's the Anderson case out of the – it was cited in the pleadings, Southern District of New York. Now we're getting down to pretty weak authority. Any more? No disrespect to the Southern District of New York. No disrespect. It's just not finding on us. No, no, no, no, Your Honor. Of course, I tried to look for Ninth Circuit law. There just wasn't. The Supreme Court's always nice, too. It's always nice. Of course, there wasn't anything to my knowledge. Mina is the best for you, and it takes care of pretty much everything but the gun, but it doesn't do you any good on the gun. Because that was not an issue in Mina. Clearly, the handcuffing under Mina, not an issue. The detention. Gun is what I'm looking for. What I've got is McKenzie, McDonald, Robinson and Anderson to try to figure out what constitutional law a reasonable officer should have known when they did this. Yes, Your Honor. And I would submit that at that point in time, the mere placing of a gun, if it happened. Not placing a gun. Placing a gun against the head of an 11-year-old. Yes, Your Honor. Okay. Yes. Okay. If there's no further questions, I'm running out of time, and I would submit. Thank you, counsel. Ladies and court, I'll be abundantly brief with my remaining two seconds. First of all, there is nothing in the record before Your Honors that I've seen at least in order to come out of discovery that their expert had made a report of anything. Did you put an expert in? We have not put an expert in. Okay. We do not have such an expert. Any more cases besides the court? I want to leave you with one quotation, Your Honor, and it comes from a case that was decided by this court earlier this year in April entitled Baldwin v. Yes, but that was as of what time? Well, here's the quote, Your Honor. I know the quote. I want to know when it was. Because just like Robinson. Well, this case didn't come down until 2009. No, I know, but it's important for this case to know what the law was as of 1998. And Baldwin was not, as I recall, correct me if I'm wrong, Baldwin was a dentist at his home suspected of growing marijuana, and they burst in and put a gun to him while he was proned out on the floor, and then they went after the wife as she came out of the bedroom. All of that may help you, but it's not the law as of 1998, is it? The incident at issue in the Baldwin case took place on September 22, 1998. Okay. Admittedly, some six or more months after this case, but long before Robinson was decided. But the quote doesn't even go to that. The quote is simply this. The civil right of the plaintiffs to be free from battery by gun-wielding officers, a right established in this circuit since 1984, citing the McKenzie case which counsel talked about and which we've briefed and cited in our brief. And since I'm over my time, I will leave the court with that. Thank you very kindly. Thank you. And thank you for refreshing me as to when the effective date of the search was. Thank you, counsel. Techley v. United States is submitted.
judges: Kleinfeld, Tashima, Fisher